# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*US Bank National Ass'n v. Villasenor*, 2012 IL App (1st) 120061

---

| | |
|---|---|
| Appellate Court Caption | US BANK NATIONAL ASSOCIATION, as Trustee for WFALT 2005-02, Plaintiff and Cross-Defendant-Appellant, v. BENJAMIN VILLASENOR, JR., a/k/a Benjamin S. Villasenor, Jr., UNKNOWN OWNERS and NONRECORD CLAIMANTS, Defendants and Cross-Defendants (Ruthie Lee Ellis, Intervenor and Cross-Plaintiff-Appellee; Property Tax Counselors, Inc., a Dissolved Illinois Corporation, and Unknown Shareholders of Property Tax Counselors, Inc., Cross-Defendants). |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-0061 |
| Filed | October 5, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Plaintiff bank was properly denied summary judgment in its foreclosure action on the ground that it was not a *bona fide* mortgagee without notice of intervenor's interest in the property, especially in view of plaintiff's involvement in the transactions that resulted in defendant mortgagor acquiring title to the property as part of intervenor's attempt to obtain funds to pay delinquent real estate taxes and plaintiff's failure to discover that intervenor's relatives lived there. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07-CH-22660; the Hon. Pamela Gillespie and Jesse Reyes, Judges, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Ronald A. Damashek and Melissa J. Lettiere, both of Stahl Cowen Crowley Addis LLC, of Chicago, for appellant. |
| | |
| | Jeffrey S. Blumenthal and Rodney C. Slutzky, both of Law Offices of Slutzky & Blumenthal, of Chicago, for appellee. |
| | |
| Panel | PRESIDING JUSTICE GORDON delivered the judgment of the court, with opinion. |
| | Justices Hall and Garcia concurred in the judgment and opinion. |

## OPINION

¶ 1                                           BACKGROUND

¶ 2                    I. Complaint to Foreclose Benjamin Villasenor's Mortgage

¶ 3       Defendant, Benjamin Villasenor, purchased a home located at 11724 South Bishop Street (the subject property) from First Suburban National Bank (First Suburban) on June 7, 2005. On June 23, Villasenor obtained a $99,000 loan from Wells Fargo Bank[1] secured by a mortgage, recorded August 3, 2005. Villasenor defaulted on his mortgage on May 1, 2007, and Wells Fargo filed a complaint to foreclose on August 21, 2007. On November 7, 2007, Wells Fargo filed a motion for an order of default and for judgment for foreclosure and sale for Villasenor's failure to file an appearance and answer or otherwise plead.

¶ 4       An order of default and judgment for foreclosure and sale was entered on December 10, 2007. The notice of sale was mailed to two separate addresses, one of which was the subject property. At the time the notice was mailed to the subject property, Michael Ellis was the occupant of the home. At the judicial sale, the property was sold to Wells Fargo. On April 24, 2008, Wells Fargo filed a motion to approve the report of sale and for the entry of an order of possession, which was granted the same day.

¶ 5              II. Ruthie Lee Ellis's Intervention and Complaint to Quiet Title

¶ 6       Ruthie Lee Ellis, the intervenor, age 73, alleges in her intervenor's complaint, affirmative defense, and complaint to quiet title that she had owned the home since 1972 and lived in the home with her son, Andre Ellis, until 1985. Ellis then moved out and Andre, or other relatives, continued to reside in the home until 2003. Later, Andre moved out and Michael Ellis, a grandson, moved in and resided in the home until 2009. From 2009 through the commencement of the instant action, Martez Knox, another of Ellis's grandsons, has lived

---

[1]Wells Fargo assigned its interest in the mortgage to US Bank, as trustee for WFALT 2005-02.

in the home.

¶ 7     In 2004, Ellis became aware that her 2000 Cook County real estate taxes had been sold in a tax sale. To avoid losing the property, Ellis sought a loan to pay off the overdue taxes. She began searching for loan providers and was contacted by Property Tax Counselors, Inc. (PTC). On September 23, 2004, Ellis signed a written agreement drafted by PTC (the PTC agreement) and, pursuant to the agreement, executed a warranty deed in trust on the same day, conveying title to the home to First Suburban as trustee of trust number 9892-01, a land trust. The terms of the PTC agreement are noted below. After recording the warranty deed on October 4, 2004, the trustee transferred the property to trust No. 9896-01 via trustee's deed on December 8, 2004.[2] However, the deed indicates that the transfer between trusts was exempt from transfer taxes.

¶ 8     Ellis alleges in her motion for summary judgment, addressed in a later section, that Villasenor purchased the subject property on June 7, 2005. However, Ellis's account of the chain of title hereafter differs from that of US Bank because she alleges that Villasenor purchased the property, not from First Suburban as trustee, but rather from a company called CRG Investments, LLC (CRG). In her motion she attempts to introduce into evidence a real estate contract indicating Frank Lopez, an associate of CRG, as the seller, and Villasenor, also an associate of CRG, as the buyer; however, this contract was not admissible for want of authentication. In the contract, both Lopez and Villasenor list the same addresses next to their names: 1475 W. Irving Park Rd. Chicago, IL 60613. Ellis alleges that this address matches the addresses of both PTC and CRG. She relies on an "LLC-5.5 form" entitled "Illinois Limited Liability Company Act, Articles of Organization" that was filed with the Secretary of State on August 4, 2004 as evidence to link the Irving Park address to CRG. However, a "Cyber Drive LLC" member search from April of 2010, also admitted as evidence, does not indicate a matching address for CRG, yet does list Lopez and Villasenor as members. Regardless, a trustee's deed was recorded on August 3, 2005 indicating a sale from First Suburban to Benjamin Villasenor; Villasenor does list the allegedly matching PTC/CRG address on this deed. However, it is unclear if Villasenor accepted title as an individual or as a representative of CRG.

¶ 9     Once Villasenor had title, Ellis alleges in her motion to intervene, he conveyed title to a third bank: Lasalle Bank National Association as trustee for trust number 134185. Ellis admits the quitclaim deed in trust as proof of this conveyance recorded July 20, 2005. Lasalle Bank has never been a party to this action, its possession of title is not disputed, and its quitclaim deed is not addressed again. Thereafter, Villasenor mortgages the very same property and conveys title to Wells Fargo in a mortgage recorded August 3, 2005. Nonetheless, after Ellis executed a warranty deed pursuant to her agreement, the subsequent transfers occurred under authority of the deed and terms of the agreement.

¶ 10    The PTC agreement outlined the terms of a $10,210.63 loan in which Ellis alleges, in her affirmative defense and complaints, that her property served as security for the loan. Paragraph 4 of the PTC agreement, entitled "Promise to Pay," reads in part: "If the Grantor

---

[2]The beneficiary of either trust is not identified in the record of this case.

[Ellis] shall fail to pay any monthly payment at the times, place and in the manner above provided *** the PTC by reason thereof shall be authorized to declare the Term ended, an acceleration clause will apply and the right to repurchase will be forfeited ***."

¶ 11 Paragraph 6, entitled "Collateral," reads: "The Grantor acknowledges that the PTC is securing the property in order to resell it to the Grantor or sell it to a third party purchaser, if and in the event the grantor defaults on any terms of this agreement." The agreement required that a warranty deed in trust be conveyed to PTC, but stated that Ellis held the right to repurchase her property and explained how Ellis could exercise such a right.

¶ 12 Paragraph 10, entitled "Transfer of Title," reads in part: "If Grantor complies with all the requirements for the exercise of the Right to Repurchase, PTC shall convey (or shall cause to be conveyed) to Grantor merchantable title to the Premises by special warranty deed, free and clear of all liens and encumbrances ***."

¶ 13 Paragraph 13 reads: "This agreement contains all the terms and provisions of the understanding between the parties. There are no other promises or agreements other than those contained herein."

¶ 14 Paragraph 14 reads: "This agreement shall be construed in accordance with the laws of the State of Illinois." Paragraph 15 provides: "Grantor shall not record or file this agreement (or any memorandum hereof) in the public records of any county or state."

¶ 15 Paragraph 18, entitled "Express Acknowledgment," reads:

"Grantor expressly acknowledges hereby that PTC has the right at any time during the term of this [a]greement to encumber title and/or convey ownership of PTC's interest in the Agreement premises notwithstanding Grantor's *** Right to Repurchase ***. It is expressly agreed hereby that any such conveyance by PTC shall not be deemed an anticipatory breach and/or default of PTC's obligations under this said Agreement, and notwithstanding any such conveyance, Grantor shall continue to be obligated to perform any and all undertakings, promises, covenants, and agreements as provided in this said Agreement, said performances, and each of them to continue to be rendered to PTC hereunder or to PTC's successor as directed by written notice forwarded by PTC to Grantor. PTC expressly undertakes hereby to reacquire title to the subject premises such that PTC will be in a position to perform as provided in paragraph 10 above."

¶ 16 On April 1, 2007, Ellis secured a second loan from PTC for $3,764.19, alleging in her deposition that she needed the money to pay off water bills and property taxes. An identical agreement was executed for that loan. Ellis alleges in her complaints, affirmative defense, and motions that she made all payments due under both PTC loans until October of 2007 when her mailed payments were returned by the United States post office showing that PTC was not located at the address and had left no forwarding address. All efforts to locate PTC were unsuccessful.

¶ 17 Ellis alleges in her motion for leave to intervene that she learned of a cloud on her title on April 28, 2008 after receiving notice that her property had been foreclosed and that an eviction action had commenced. In response she filed, on May 21, 2008, a motion for leave to intervene in the Villasenor foreclosure and a motion to vacate the judgment for foreclosure and the order confirming the sale. On August 7, 2008, the court permitted Ellis to intervene

and granted her request to vacate the April 24 order approving the report of sale and possession order, and the December 10 judgment of foreclosure and order confirming the sale. The court granted Ellis leave to file an answer, affirmative defense, and complaint to quiet title.

¶ 18   Ellis alleges in her affirmative defense and complaint that the warranty deed was represented to her and in the PTC agreement as only security for her loan. Ellis claimed that the agreement and warranty deed she executed created an equitable mortgage.

¶ 19   Ellis further alleges in her motion to intervene and affirmative defense that since she remained in title, all transfers after the deed was recorded in trust No. 9892-01 were void for lacking consideration. Ellis also alleges that PTC would be required to foreclose on her mortgage in accordance with Illinois Mortgage Foreclosure Law (735 ILCS 5/15-1101 *et seq.* (West 2004)) before title could pass to a third party.

¶ 20   Lastly, Ellis alleges in her motion and affirmative defense that all payments due under the agreement were delivered to PTC as required until October 2007. In her complaint to quiet title, she alleges that these payments total $13,345.40, which is more than the sum required to satisfy the indebtedness due. In October of 2007 she attempted to exercise her right to repurchase and made efforts to find PTC to no avail. Ellis alleges that she should have reacquired merchantable title.

¶ 21                                III. Depositions

¶ 22   The following are excerpts from Ruthie Lee Ellis's deposition regarding the agreement she signed with PTC, which was admitted in evidence.

"PLAINTIFF'S COUNSEL: Let's turn to the second page. Do you recognize the second page of this document? [Warranty Deed]

ELLIS: Yes. I signed it.

PLAINTIFF'S COUNSEL: Did you read this document before you signed it?

ELLIS: No, I did not.

PLAINTIFF'S COUNSEL: Was it explained to you?

ELLIS: Yes, they explained it. They went through it. Yes, they did.

PLAINTIFF'S COUNSEL: What did you understand about this document?

ELLIS: I thought you had to sign all of these forms in order to get the loan. That is the only thing. I signed these forms in order to get the loan.

PLAINTIFF'S COUNSEL: But what did you understand that these documents said?

ELLIS: I didn't know it said he was taking my property. I did not know that.

***

PLAINTIFF'S COUNSEL: Do you see about three quarters of the way down the page [of the PTC Agreement] by paragraph three where it says, 'Warranty Deed in Trust' in bold?

ELLIS: Yeah.

PLAINTIFF'S COUNSEL: Do you remember reading that provision before you signed this document?

ELLIS: No.

PLAINTIFF'S COUNSEL: Do you remember this provision being explained to you?

ELLIS: I don't think it were.

PLAINTIFF'S COUNSEL: If you read that paragraph now, what does that paragraph say? What do [you] understand that paragraph to mean?

ELLIS: Right now it says you giving the other people the warranty and deed of your property. But up above that it says where I was getting the $10,000 to pay the taxes on the property.

PLAINTIFF'S COUNSEL: Did you understand that you had to give a deed to the Bishop property in order to get the loan?

ELLIS: No, I did not.

PLAINTIFF'S COUNSEL: You didn't understand that?

ELLIS: No, I did not. Nobody explained that to me.

\*\*\*

PLAINTIFF'S COUNSEL: Forgive me if I asked this question already, but when they would give you the documents and you said they explained them to you, did you read the documents?

ELLIS: No, I didn't have them in my hand like you have this paper in front of me. No, they went just down and they read it all and I was sitting there.

\*\*\*

PLAINTIFF'S COUNSEL: Was there ever anything discussed about you repurchasing the Bishop property?

ELLIS: No.

PLAINTIFF'S COUNSEL: Was there anything ever discussed about a land trust? Do you ever remember anything being discussed about a trust?

ELLIS: No.

PLAINTIFF'S COUNSEL: Did you ever have any concerns about the property credit agreement that you entered into?

ELLIS: No, I didn't because as long as I was paying, I thought everything was okay. I didn't know I was paying them and they were taking my property."

¶ 23    After addressing Ellis's understanding of the documents, Ellis was asked about the eviction notices that were posted, which led to her first notice that the property had been sold. She testified that, "When somebody come around and put all kind of papers around the house, move out, move out. \*\*\* But that's how we found out that the house had been sold. Nobody ever talked to us about nothing."

¶ 24    Both of Ellis's grandsons, Michael and Martez, were deposed. Michael testified to a time when men took pictures of the home.

-6-

"PLAINTIFF'S COUNSEL: Do you remember if other than this time in March or April of 2007, was there any other time when anyone came to the home to take pictures of the property?

MICHAEL: I recall the people that came. They came a second time.

***

PLAINTIFF'S COUNSEL: Was your grandmother there when they came the second time?

MICHAEL: No. I was there.

PLAINTIFF'S COUNSEL: Did you let them into the house?

MICHAEL: Yes.

PLAINTIFF'S COUNSEL: And they took more pictures?

MICHAEL: Yes.

***

PLAINTIFF'S COUNSEL: While they were there, did you talk to them? This is the second time. Did you talk to them at all?

MICHAEL: No. They just took pictures, and they left.

PLAINTIFF'S COUNSEL: Do you remember any conversations that took place the first time they came to visit, either conversations you had with them, or conversations they had with your grandmother?

MICHAEL: No.

PLAINTIFF'S COUNSEL: Do you remember about how many people there were that came?

MICHAEL: There was three guys.

PLAINTIFF'S COUNSEL: Do you remember any of their names?

MICHAEL: No.

***

PLAINTIFF'S COUNSEL: Mike, have you ever seen this document [Uniform Residential Appraisal Report prepared by Cynthia Tengler-Hansen] before?

MICHAEL: No."

The following exchange comes from Martez's deposition and is relevant because Martez acted as witness when Ellis first signed the PTC agreement. Martez reviewed the agreement along with Ellis during the meeting with PTC representatives. Although allegedly appearing on behalf of PTC, both Benjamin Villasenor and Ignacio Villasenor are listed as members of CRG Investments, LLC. A "Cyber Drive LLC" member search completed in April of 2010 was admitted as evidence and supports this fact. Martez was also present for the appraisal.

"PLAINTIFF'S COUNSEL: You said that Ignacio was one of the gentlem[e]n. There was another gentleman there?

MARTEZ: Yes.

PLAINTIFF'S COUNSEL: Do you remember his name?

\*\*\*

MARTEZ: I think it was Benjamin Villasenor.

PLAINTIFF'S COUNSEL: Do you remember a gentleman named Rick?

MARTEZ: I think that's what she [Ellis] called him.

PLAINTIFF'S COUNSEL: What she called Ben or Ignacio?

MARTEZ: I think that's what she called Ignacio[.] \*\*\*

PLAINTIFF'S COUNSEL: Do you remember if they worked for a company?

MARTEZ: I thought it was their company.

PLAINTIFF'S COUNSEL: Do you remember the name of it?

MARTEZ: Property Tax Counselors.

\*\*\*

PLAINTIFF'S COUNSEL: You said there was an appraisal too. \*\*\* Were you there for the appraisal?

MARTEZ: Yeah, I'm certain I was–I believe I was there. I mean, they just came in and did like a–I mean, like a walk through, basically. They didn't look at anything.

PLAINTIFF'S COUNSEL: Who is 'they'? Ignacio and the other gentleman?

MARTEZ: I know Ignacio was one of them. I'm almost certain of that. I can't remember if Benjamin was the other guy with him though.

\*\*\*

PLAINTIFF'S COUNSEL: Was your grandmother there?

MARTEZ: I don't think she was there, no.

\*\*\*

PLAINTIFF'S COUNSEL: Do you remember if you had a conversation with them during that time about anything?

MARTEZ: Nothing in particular, no.

\*\*\*

PLAINTIFF'S COUNSEL: Okay. Did you believe that your grandmother understood the terms of this [PTC] agreement when she signed it?

\*\*\*

MARTEZ: I mean, I think that she, probably she and I, probably took their explanation of it a little bit more than we should have. So, yes, the answer would be yes."

¶ 25                    IV. Motions for Summary Judgment

¶ 26                    A. US Bank's Motion for Summary Judgment

¶ 27    US Bank filed a motion for summary judgment on March 3, 2010. 735 ILCS 5/2-1005 (West 2008). In this motion, the bank included Villasenor's mortgage, the assignment of mortgage from Wells Fargo to US Bank, deposition testimony of Ellis, Michael, and Martez, the PTC agreements of 2004 and 2007, the warranty deed in trust showing the conveyance

from Ellis to First National, the trustee's deed showing the conveyance between the First National trusts, and the trustee's deed showing a conveyance between First National and Villasenor. US Bank claims that, as a matter of law, Ellis's equitable mortgage claim could not defeat the bank's mortgage because the bank was first to record its interest in the property and had no notice of Ellis's equitable claim.

¶ 28 US Bank alleges in its summary judgment motion that it had no actual or constructive notice of any other interest in the property that would have prevented a valid sale and subsequent mortgage. US Bank alleges that in searching the chain of title it was not alerted to any other interests because Ellis's claimed equitable mortgage was never recorded. US Bank alleges that Ellis's failure to record led the world to believe that title to the property was held in the land trust and that the land trust had the authority to convey the property. It further alleges that if Michael lived in the home, that did not constitute notice, nor did it require the bank to inquire further.

¶ 29 US Bank alleges that no evidence in the appraisal suggests that Michael Ellis was living in the house. US Bank alleges that the property owner would have had to be the occupant to place it on notice, and, since Michael is only the grandson of Ellis, that did not operate as notice.

¶ 30 US Bank further alleges that the matching PTC/CRG addresses listed by Lopez and Villasenor would not have required a "deeper" inquiry. US Bank also alleges that a discrepancy in the actual versus the reported sale price was insufficient to place it on notice. US Bank attempts to rely on the appraisal as evidence in which the appraiser wrote: "The current sellers/owners [allegedly CRG] were contacted and/or, the tax transfer records were searched. It appears from the research that the subject property transferred ownership 10/04 for $86,000. The past sale was verbally verified through the seller. The assessor reported the sale occurring 10/04 as $10,500 which the seller stated was incorrect." Ellis attempted to admit into evidence the real estate contract between Lopez and Villasenor, and the appraisal to no avail because the real estate contract and the appraisal were not authenticated and no foundation was laid.

¶ 31 Lastly, US Bank alleges that Ellis was bound by her actions in signing an agreement she did not understand. US Bank concedes that had Ellis properly exercised her right to repurchase, PTC would be obligated to reacquire title and reconvey the property. If Ellis did in fact comply with the terms of her agreement, and repay PTC in full, PTC could be held in breach of contract for failing to reconvey the title. However, even in that case, US Bank alleges that the breach would not affect Ellis's original assent to the terms of the agreement. US Bank alleges that these terms and Ellis's assent enabled all successive sales. In the case at bar, US Bank alleges that although PTC had acted fraudulently, Ellis should be the party held responsible because she initially authorized PTC to act within the terms of the agreement.

¶ 32 B. Ellis's Response and Cross-Motion for Summary Judgment

¶ 33 On May 3, 2010, Ellis filed a response to US Bank's motion for summary judgment, as well as a cross-motion for summary judgment. In this motion, Ellis included "certificates"

on behalf of herself, Michael Ellis, and Martez Knox. These certificates are unnotarized statements admitted as evidence under the Code of Civil Procedure, section 1-109, entitled "Verification by certification." 735 ILCS 5/1-109 (West 2008). Ellis, Michael, and Martez each signed a statement that says, "Under penalties of perjury as provided by Section 1-109 of the Illinois Code of Civil Procedure, I, [name], hereby certify that the foregoing statements in this Certificate are true." The motion also included the amortization schedule for the 2004 loan, an invoice showing receipt of payments for the 2007 loan, a trustee's deed showing conveyance between the First National trusts, a trustee's deed showing conveyance between First National and Villasenor, and a quitclaim deed in trust showing conveyance between Villasenor and Lasalle Bank National Association. This quitclaim deed is mentioned very briefly in Ellis's motion as an inconsistency in the chain of title; it is never addressed again throughout the record or in any proceedings. Although not considered, Ellis attached Villasenor's real estate contract, loan application, and appraisal to her motion.

¶ 34      In her motion, Ellis alleges that US Bank was notified of her interest in the property and that since the bank was on notice of her interest in the property, it was not a *bona fide* mortgagee, and thus, never had a valid mortgage. Ellis alleges that US bank had constructive notice of her interest in the property because Michael was living in the home at the time of the sale to Villasenor, and the discrepancy between the appraisal value and tax stamps on Ellis's warranty deed required a greater inquiry. Ellis also alleges that the appraisers sent by US Bank met Michael and had notice of a tenant living in the house. Ellis alleges that had US Bank spoken to Michael Ellis, his answers would have led the bank to Ellis and her interest in the property.

¶ 35      Ellis alleges further that US Bank was on notice of her interest based solely on the tax stamps on the warranty deed between Ellis and First Suburban. The tax stamps indicated that the property was sold for $10,500. Thus, when US Bank had the property appraised at $115,000, it was placed on notice of the drastic difference in consideration in the value of the property. Ellis alleges that this notice imputes a duty of further inquiry.

¶ 36      Ellis, in her summary judgment motion, also questioned the legality of the property sale between Trust 9896-01 and Villasenor. Ellis raised this claim because it was not clear that the sale was solely between trust No. 9896-01 and Villasenor. Although Ellis did not formally raise claims of fraud against PTC, she relied on the unauthenticated real estate contract and suggested that fraud was at play because Villasenor's name appeared as a partner of the company listed as the seller, CRG; Villasenor was also listed individually as the buyer. The addresses of the buyer, Villasenor, and seller, CRG, were also the same yet did not match the address of the subject property.

¶ 37      Ellis also alleges that PTC defrauded her in their representations of the agreement. When Ellis executed the PTC agreement, Martez acted as a witness and reviewed the document. At the time of signing, Ellis had a high-school education and Knox was in pursuit of a business management degree from Robert Morris College. Ellis believed that the agreement vested her property interest as security with PTC; she alleges she did not realize that the agreement had actually conveyed her interest to the land trust. In an unnotarized "certificate" submitted by Ellis, she stated:

"I did not read all of it [PTC Agreement] before signing it, but [PTC employee] explained it was necessary for the loan and that I could not lose the house as long as I paid the loan back as agreed. I never had any intention of selling *** the house nor would I ever have done so ***. In every conversation I had with [PTC employee, he] told me he was giving me a loan and that when I finished paying the loan, I would still own the property. Based on his explanations, I believed I was getting a loan and as agreed, I paid the loan back so I would not lose my house."

In a similar "certificate," Martez Knox stated:

"I understood that [PTC] was providing my grandmother a loan to pay some taxes. *** [PTC employee] further explained that as long as she paid the money back, she could not lose the house. At no time did [PTC employee] say anything that she was selling him the property. I do know that at no time did anyone ever ask for the keys or was there ever any request that Michael [Ellis] move out of the house as a result of the loan."

Although Ellis does not allege a formal fraud claim, she asks that these facts should be considered in classifying her agreement with PTC and her conveyance of the warranty deed to First Suburban as an equitable mortgage. Ellis alleges that when PTC required her to execute a warranty deed and then later sold the property to Villasenor, it committed fraud in the inducement. However, Ellis alleges that US Bank is also at fault for ignoring facts that would have led a diligent lender to conclude that Villasenor did not have merchantable title. Thus, Ellis alleges that US Bank was never a *bona fide* mortgagee because it had constructive notice of Ellis's adverse interest and therefore her interest should be considered an equitable mortgage.

¶ 38    In support of her argument for an equitable mortgage, both in the trial court and before us, Ellis relies on section 5 of the Mortgage Act (765 ILCS 905/5 (West 2004)). The Mortgage Act reads, "Every deed conveying real estate, which shall appear to have been intended only as a security in the nature of a mortgage, though it be an absolute conveyance in terms, shall be considered as a mortgage." 765 ILCS 905/5 (West 2004). Ellis alleges that the Illinois Mortgage Foreclosure Law section 15-1207(c) also addresses a deed intended as security for a loan but executed as an absolute conveyances on its face. Ellis alleges that these statutes should apply to her mortgage. US Bank requests that we consider the Conveyances Act, section 30 to bind Ellis in her conveyance. 765 ILCS 5/30 (West 2004). The statute pertinently reads, "creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30 (West 2004). Ellis alleges that the Illinois Mortgage Foreclosure Law and the Mortgage Act should apply to her deed because those statutes are written more broadly. She alleges that if we rely on the Conveyances Act and call her deed a conveyance, the courts would render the Illinois Mortgage Foreclosure Law and the Mortgage Act inapplicable in the exact situation the legislature intended them to apply. Thus, she urges that the deed be called an equitable mortgage.

¶ 39                    V. Trial Court's Written Memorandum on August 30, 2010

¶ 40        After a hearing on the motions for summary judgment, the court issued a written memorandum opinion and order on August 30, 2010. First, the trial court stated that it would not consider the real estate contract or loan application submitted by Ellis because they were not authenticated. Next, the court found that Ellis's 2004 and 2007 loans from PTC would operate as equitable mortgages, but only against PTC. In reaching this conclusion, the court relied on the four factors set out in *Silas v. Robinson* to determine whether the deed was a conveyance or a mortgage: "Relevant factors to determine whether the deed absolute in form was intended to be a mortgage include [(1)] the relation of the parties, [(2)] the circumstances surrounding the transaction, [(3)] the adequacy of consideration, and [(4)] the situation of the parties after the transaction." *Silas v. Robinson*, 131 Ill. App. 3d 1058, 1062 (1985). Despite Ellis's argument that the Illinois Mortgage Foreclosure Law "trumped" the Conveyances Act, the court found no legal basis for this claim. The court found that since there is a third party involved, the Conveyances Act must be applied. For this reason the court found the PTC agreement to be an equitable mortgage between Ellis and PTC, and a conveyance as to the rest of the world. Subsequent purchasers and mortgagees must be able to rely on the record.

¶ 41        The court also found that US Bank did not have actual notice of Ellis's interest. In determining if constructive notice was present, the court considered both record notice and inquiry notice. The court found that there was no record notice because all documents indicated that Ellis conveyed her interest to the land trust. Because Ellis never properly recorded her agreement with PTC, there was no record of her property interest in the chain of title. The court also found that the presence of Michael Ellis did not require US Bank to inquire further. The court explained that the sale between trust No. 9896-01 and Villasenor was not inconsistent with a tenant's presence on the property. Thus, the presence of Michael, as a tenant, did not place US Bank on notice, nor did it require that the bank inquire further into the landlord-tenant relationship.

¶ 42        Finally, the court decided that issues of fact regarding US Bank's status as a *bona fide* mortgagee remained. For this reason, the court denied both US Bank's and Ellis's motions for summary judgment.


¶ 43                         VI. US Bank's Motion to Reconsider and
                              Trial Court's Written Memorandum

¶ 44        On September 29, 2010, US Bank filed a motion to reconsider and asked the court to vacate its opinion of August 30, find the bank to be a *bona fide* mortgagee, and grant the motion for summary judgment in its favor. US Bank alleges that because the tenancy relationship between Ellis and her grandson was not inconsistent with the public record, this relationship did not place the bank on notice of Ellis's interest as a matter of law. US Bank denies Ellis's claim that it had a duty to inquire further to satisfy inquiry notice. US Bank also alleges that, had it inquired further, there was nonetheless no certainty that it would be led to Ellis's purported interest.

¶ 45        On January 19, 2011, Ellis filed a response to US Bank's motion to reconsider and a second motion for summary judgment, alleging that because there was no material issue of

fact relating to the bank's status as a *bona fide* mortgagee, the court should grant her request to quiet title.[3] She also alleges that US Bank's discovery responses authenticated the appraisal, loan agreement, and real estate contract, making them admissible evidence to prove the bank had constructive notice.

¶ 46    On April 15, 2011, the court issued a new written memorandum opinion and order concerning US Bank's motion to reconsider. The trial court again denied Ellis's attempt to admit the excluded documents into evidence. The court explained that it was too late in the proceedings to admit the documents from the loan application file in the way that Ellis presented them to the court.

¶ 47    The court reviewed its prior decision that a material issue of fact remained to be decided regarding US Bank's status as a *bona fide* mortgagee. The court noted that the facts demonstrated that the seller was not in possession of the home, which placed a duty upon US Bank to inquire further as to the possessor's interest in the home. The trial court found that had Michael been questioned, he would have led US Bank to Ellis.

¶ 48    The court also found that since the public record revealed that the most recent deed was exempt from transfer taxes, indicating the transfer between the two First Suburban trusts, there was no evidence of a sale between the trusts managed by First Suburban. The court noted that this should have led US Bank to review the next deed in the chain of title, which would have revealed Ellis's alleged sale to the land trust at a value significantly less than the market value. This examination of the chain of title was also imputed to US Bank and, if discovered through due diligence, would have resulted in a question of consistency: Why was Ellis acting as landlord for a property that she had apparently sold years earlier? The court concluded that the only logical inference was that Ellis believed she still owned the property, and US Bank was on constructive notice to make an inquiry of this interest. Since US Bank was on constructive notice of Ellis's interest, the bank was never a *bona fide* mortgagee. Consequently, the court reconsidered its order denying the cross-motions for summary judgment and then denied US Bank's motion for summary judgment and granted Ellis's.

¶ 49    On May 13, 2011, US Bank filed a second motion to reconsider, which was denied on December 9, 2011. US Bank filed a notice of appeal on January 6, 2012, and this appeal followed.

¶ 50                                          ANALYSIS

¶ 51    On appeal, US Bank raises a challenge to the summary judgment below that denied it the protections of a *bona fide* mortgagee. US Bank asks us to determine whether knowledge of Michael's possession in the property, and the inadequate consideration exchanged for Ellis's warranty deed, placed the bank on inquiry notice of Ellis's interest in the property. It further asks us to consider whether the trial court erred in not considering the appraisal of the property as evidence. US Bank ultimately asks us to find that the summary judgment was improperly decided and should be reversed in its favor.

---

[3]The court denied Ellis's request for leave to file the second motion for summary judgment.

¶ 52       As an initial note, the arguments regarding the appraisal, the real estate contract between Villasenor and CRG, and the loan application will not be considered on appeal because the documents were not considered by the trial court and they will not change our decision on review. US Bank encouraged the trial court to avoid considering the appraisal, yet now requests us to consider it. Ellis attempted to admit the documents into evidence and US Bank initially opposed this attempt in "U.S. Bank's Response and Objections to Ruthie Lee Ellis's Request to Admit Facts." US Bank admits that it produced the documents per Ellis's request, but then objects that they "are genuine, true and correct copies of the documents." US Bank denies receiving a transfer of the documents when Wells Fargo assigned the mortgage and loan files to US Bank. US Bank also denied that the documents were kept in a loan file as part of its ordinary course of business. US Bank raised several other objections about the form of the questions, the compound use of terms, and the ambiguity of terms. Furthermore, in the document "Plaintiff's Response to Ruthie Lee Ellis's Supplement to Her Cross-Motion for Summary Judgment and Response to Plaintiff's Motion for Summary Judgment," US Bank encouraged the court not to admit the documents into evidence. "Ruthie Lee has not laid the proper foundation to establish that these documents constitute business records *** or otherwise constitute evidence that would be admissible at trial."

¶ 53       In light of these facts in the record, we are puzzled when US Bank accuses the trial court of "erroneously" finding that the "appraisal was not properly authenticated, and therefore, did not consider the appraisal as admissible evidence." US Bank alleges on appeal that it "did not challenge the admissibility of the appraisal." But we are not persuaded. The record presents us with US Bank's clear objection to admitting these documents into evidence. Now, US Bank alleges that the appraisal should be included and accuses Ellis of violating the tenet set out in "*Gillespie v. Chrysler Motors Corp.*, 135 Ill. 2d 363, 374 (1990) (holding that where a party introduces evidence, he cannot later complain of its admissibility)." Conversely, US Bank cannot steadfastly oppose the admission of documents into evidence, then follow that the document should be admitted.

¶ 54       US Bank alleges that it would rely on the appraisal to prove that Ellis's alleged inadequate consideration for conveyance of her title to First Suburban was actually adequate. As noted above, US Bank alleges that the evidence to support this lies in the appraisers admission that they contacted the seller (allegedly CRG) to confirm that the consideration in Ellis's conveyance was not $10,500 but $86,000. US Bank further alleges that the appraisal would prove that no evidence existed of Michael's occupancy. Were the appraisal properly admitted as evidence, both arguments would fail. The consideration argument would be inadmissable hearsay and the appraisal clearly shows that a tenant resided on the property and paid rent of "$850.00 [which] is slightly below the typical market range for the rental of single family homes in the area."

¶ 55                                         I. Standard of Review

¶ 56       "Summary judgment is proper where, when viewed in the light most favorable to the nonmoving party, the pleadings, depositions, admissions, and affidavits on file reveal that there is no genuine issue as to any material fact and that the moving party is entitled to

-14-

judgment as a matter of law. *General Casualty Insurance Co. v. Lacey*, 199 Ill. 2d 281, 284 (2002); 735 ILCS 5/2-1005(c) (West 2004)." *Buenz v. Frontline Transportation Co.*, 368 Ill. App. 3d 10, 14 (2006). Whether or not the trial court erred in granting summary judgment is a question of law and subject to a *de novo* standard of review. *Williams v. Manchester*, 228 Ill. 2d 404, 417 (2008); *Amalgamated Transit Union v. Chicago Transit Authority*, 342 Ill. App. 3d 176, 179 (2003); *General Casualty Insurance Co.*, 199 Ill. 2d at 284 (2002). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011). It may be stated generally that, if what is contained in the pleadings and affidavits would have constituted all of the evidence before the court and upon such evidence there would be nothing to be decided by the trier of fact, the court would be required to grant summary judgment. See *Fooden v. Board of Governors of State Colleges & Universities*, 48 Ill. 2d 580, 587 (1971); *People ex rel. Sharp v. City of Chicago*, 13 Ill. 2d 157 (1958); *Shirley v. Ellis Drier Co.*, 379 Ill. 105 (1942).

¶ 57                    II. US Bank's Notice of Ellis's Equitable Interest

¶ 58    The primary issue we are to consider is whether US Bank had notice of Ellis's interest prior to granting the Villasenor mortgage. The law measures *bona fide* purchasers and mortgagees under the same standards. US Bank must qualify as a *bona fide* mortgagee to retain an interest in the property. In order to successfully foreclose on the property, US Bank must establish that it acquired an "interest in [the] property for valuable consideration without actual or constructive notice of another's adverse interest in the property." *In re Ehrlich*, 59 B.R. 646, 650 (Bankr. N.D. Ill. 1986) (citing *Life Savings & Loan Ass'n of America v. Bryant*, 125 Ill. App. 3d 1012, 1019 (1984)). If US Bank meets these requirements it would obtain the role of a *bona fide* mortgagee. In the case at bar, US Bank denies that it had actual or constructive notice of Ellis's interest.

¶ 59    Actual notice is that knowledge the purchaser had at the time of the conveyance. *Bryant*, 125 Ill. App. 3d at 1019. The parties agree that US Bank did not have actual notice. Thus, the next inquiry is whether the bank had constructive notice. Constructive notice is knowledge that the law imputes to a purchaser, whether or not he had actual knowledge at the time of the conveyance. See generally *In re Application of Cook County Collector for Judgment & Sale Against Lands & Lots Returned Delinquent for Nonpayment of General Taxes for the Year 1985*, 228 Ill. App. 3d 719, 734-35 (1991); *City of Chicago v. Cosmopolitan National Bank*, 120 Ill. App. 3d 364, 368 (1983); *In re Application of County Treasurer*, 30 Ill. App. 3d 235, 240 (1975); *Landis v. Miles Homes Inc.*, 1 Ill. App. 3d 331 (1971). There are two kinds of constructive notice: record notice and inquiry notice. *LaSalle Bank v. Ferone*, 384 Ill. App. 3d 239, 245 (2008) (citing *In re Ehrlich*, 59 B.R. 646, 650 (Bankr. N.D. Ill. 1986)). Both parties agree that US Bank did not have record notice because Ellis's interest in the property was not recorded because the PTC agreement prevented recordation. Thus the chain of title does not impute record notice on US Bank. The bank relies on section 30 of the Conveyances Act (765 ILCS 5/30 (West 2004)) to explain in relevant part that all mortgages:

"which are authorized to be recorded, shall take effect and be in force from and after the time of filing the same for record, and not before, as to all creditors and subsequent purchasers, without notice; and all such deeds and title papers shall be adjudged void as to all such creditors and subsequent purchasers, without notice, until the same shall be filed for record." 765 ILCS 5/30 (West 2004).

US Bank argues that, "the first mortgage recorded has priority. *Firstmark* [*Standard Life Insurance Co. v. Superior Bank FSB*], 271 Ill. App. 3d [435,] 439 [(1995)]. An unrecorded interest in land is not effective to a *bona fide* purchaser without notice. *Schaumburg State Bank v. Bank of Wheaton*, 197 Ill. App. 3d 713, 720 (1990)." *Federal National Mortgage Ass'n v. Kuipers*, 314 Ill. App. 3d 631, 635 (2000). US Bank points to the chain of title to prove that it recorded an interest before Ellis. However, Ellis argues that US Bank is on inquiry notice, yet failed to uphold its duty to inquire. In effect, she argues that, "where a party has constructive notice of a prior interest in real estate, the failure to record is not necessarily fatal to the rights of the prior interest holder. See *Dana Point Condominium Ass'n v. Keystone Service Co.*, 141 Ill. App. 3d 916, 922 (1986)." *Kuipers*, 314 Ill. App. 3d at 635.

> "The title of a purchaser whose deed has been recorded will not be postponed to a prior unrecorded conveyance except upon clear proof of actual notice of the earlier deed or of circumstances which should have induced an honest and prudent purchaser to make inquiry which would have disclosed the truth. Mere suspicion will not establish an inference of fraudulent intent. The proof must be so clear that the inference of bad faith is a necessary conclusion." *Cessna v. Hulce*, 322 Ill. 589, 597 (1926), *cited in Reed v. Eastin*, 379 Ill. 586, 592 (1942).

See also *Blake v. Blake*, 260 Ill. 70 (1913); *In re Cutty's-Gurnee, Inc.*, 133 B.R. 934, 949 (Bankr. N.D. Ill. 1991). Ellis argues that US Bank acted in bad faith by ignoring clear proof of her equitable interests. She relies most heavily on Michael Ellis's presence as an occupant of the home, and the inadequate consideration recorded in her initial conveyance evidenced in the chain of title, as proof of her interests. She argues that had US Bank inquired of Michael Ellis, inquiry would have led to Ellis's interests since Michael was her grandson. Regardless of the bank's actions, Ellis argues that the law imputes US Bank with this duty to inquire. She relies on *Cessna*, once again stating that, "[i]t is true that one having notice of such facts as would put a prudent man on inquiry is chargeable with the knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention, put the party on his guard and call for inquiry is notice of everything to which such inquiry might have led." *Cessna*, 322 Ill. at 595. See also *Reed v. Eastin*, 379 Ill. at 592. It is important to note that the law does not concern itself with whether an inquiry is actually carried out; rather, "notice is imputed to the subsequent purchaser, on account of his negligence in not prosecuting his inquiries in the direction indicated." *Anthony v. Wheeler*, 130 Ill. 128, 135 (1889). See also *Smolek v. K.W. Landscaping*, 266 Ill. App. 3d 226, 229 (1994); *Bryant v. Lakeside Galleries, Inc.*, 402 Ill. 466, 477 (1949); *Reed v. Eastin*, 379 Ill. 586, 592 (1942) (citing *Cessna v. Hulce*, 322 Ill. 589, 597 (1926)); *Doll v. Walter*, 305 Ill. App. 188, 192 (1940). See generally *Aurora National Loan Ass'n v. Spencer*, 81 Ill. App. 622, 622-25 (1898); *Robertson v. Wheeler*, 162 Ill. 566, 580 (1896); *Grundies v. Reid*, 107 Ill. 304 (1883); *Slattery v. Rafferty*, 93 Ill. 277 (1879).

¶ 60    Both parties rely on *Ehrlich* to explain the tenets of inquiry notice. *In re Ehrlich*, 59 B.R. 646, 649-50 (Bankr. N.D. Ill. 1986). *Ehrlich*, in turn relies on Illinois Supreme Court and Appellate Court cases *Miller v. Bullington*, 381 Ill. 238 (1942), and *Burnex Oil Co. v. Floyd*, 106 Ill. App. 2d 16 (1969), respectively. We will first consider the precedent set forth in *Miller* by reviewing the relevant case history that spans over 50 years.

¶ 61    We begin our review with *Miller v. Bullington*, but first must lay *Miller*'s foundational precedent in *Whitaker v. Miller*, 83 Ill. 381 (1876), and *Mallett v. Kaehler*, 141 Ill. 70, 73-74 (1892). In *Whitaker*, our supreme court found that a complainant's right of possession was evidenced by her tenants. "Her possession was notice to all the world of her rights in the premises, and inquiry of her would have disclosed a knowledge of the truth. Without inquiry, no one can claim to be an innocent purchaser of lands in actual possession of another, as against such party." *Whitaker v. Miller*, 83 Ill. 381, 386 (1876). This tenet was reinforced when the Illinois Supreme Court found, yet again, that:

> "[W]hen one purchases land in the possession of a third party, he is bound to take notice of whatever facts an inquiry as to the right of such possession would lead to. We said in *Whitaker v. Miller*, 83 Ill. 381 [(1876)], (and in substance in many other cases,) that 'the possession of land by a party, through his tenants, is notice to all the world of his rights in the premises, and without inquiry of him, no one can claim to be an innocent purchaser, as against him.' " *Mallett v. Kaehler*, 141 Ill. 70, 74 (1892).

These two 19th-century cases lay the foundation upon which the 20th-century *Miller v. Bullington* decision stands. The court in *Miller* found:

> "Again, possession of premises by a landlord through his tenant is notice of the landlord's rights. (*Mallett v. Kaehler*, 141 Ill. 70 [(1892)]). One having notice of facts which would put a prudent man on inquiry is chargeable with knowledge of other facts which he might have discovered by diligent inquiry. Whatever is notice enough to excite attention and put the party on his guard is notice of everything to which such inquiry might have led and every unusual circumstance is a ground of suspicion and demands investigation. *Reed v. Eastin*, [379 Ill. 586 (1942)]; *Struve v. Tatge*, 285 Ill. 103 [(1918)]; *Blake v. Blake*, 260 [Ill.] 70 [(1913)]." *Miller v. Bullington*, 381 Ill. 238, 243 (1942).

See also *LaSalle Bank v. Ferone*, 384 Ill. App. 3d 239, 246 (2008).

¶ 62    US Bank ignores the importance of these three holdings in protecting the rights of landlords through their tenants. Ellis repeatedly asserts that Michael, as occupant and tenant, represents her equitable interests in the property. "Such occupancy has been repeatedly held to charge a purchaser or incumbrancer with notice, and all that it would lead to, if pursued." *Crawford v. Chicago, Burlington & Quincy R.R. Co.*, 112 Ill. 314, 321 (1884). See *Doll v. Walter*, 305 Ill. App. 188, 192 (1940).

¶ 63    US Bank supports its position by noting that Michael's tenancy is not inconsistent with the record owner. The bank persistently argues that when Villasenor applied for a loan and mortgage, First National remained the record owner in a land trust. US Bank argues that Michael's tenancy is not inconsistent with this relationship and thus it is not on notice of Ellis's interests. However, US Bank reaches this conclusion only after misinterpreting *Burnex Oil Co. v. Floyd* and thus we do not find its argument persuasive. *Burnex* was

decided after the trio of supreme court cases discussed above and clearly supports their conclusions:

> "Where real estate is in the possession of someone other than the record owner, such possession is generally regarded as notice to the world of the interest represented thereby and is legally equivalent to the recording of such interest. Carnes v. Whitfield, 352 Ill. 384 *** [(1933), *cited in Beals v. Cryer*, 99 Ill. App. 3d 842, 845 (1981); *Bryant v. Lakeside Galleries, Inc.*, 402 Ill. 466, 477 (1949); *Chicago Title & Trust Co. v. Darley*, 363 Ill. 197, 204 (1936)], and Slinger v. Sterrett, 283 Ill 82 *** [(1918)]. A purchaser is bound to inquire of the person in possession by what tenure he holds and what interest he claims in the premises." *Burnex Oil Co. v. Floyd*, 106 Ill. App. 2d 16, 21-22 (1969).

Even if First Suburban was the record owner at the time Villasenor's mortgage was recorded, the home was still in Ellis's possession via Michael. Thus, this situation matches the criteria described in *Burnex*. Following the logic of *Burnex*, Ellis's equitable mortgage has all the effects of recordation because the land was in possession by someone other than the record owner. Not only does the equitable mortgage have the effects of recordation, but this also requires that US Bank foreclose on Michael's interests as occupant and tenant of the house. We note that while *Burnex* is instructive, it continues the long precedent our supreme court set forth in *Miller v. Bullington, Carnes*, *Slinger*, *Mallett*, and *Whitaker*.

¶ 64 Therefore, US Bank was imputed with inquiry notice of Ellis's interest based on Michael Ellis's possession of the home. Had the bank, or their appraisers, dutifully inquired of Michael, he surely would have responded that he rented the property from his grandmother, Ruthie Lee Ellis, who was the owner of the home. Then US Bank would have searched the chain of title further to find the recorded conveyance with inadequate consideration. These facts in tandem would have led US Bank to learn of Ellis's interest and PTC's misrepresentation and fraud. These facts are imputed to US Bank regardless of their decision to actually question Michael Ellis. The ruling in *Burnex* is certainly not an anomaly based on ancient case law; rather, the same precedent from *Miller v. Bullington* is evidenced in the 21st century as well:

> "[S]ee also *Atwood v. Chicago, Milwaukee & St. Paul Ry. Co.*, 313 Ill. 59, 62 (1924) (as long as possession is not occasional or temporary, it amounts to constructive notice, viable against the world, of any rights person in that possession may have). This may include improvements on the property, signs posted thereon, or possession by a tenant of the person claiming possession. See *Carnes*, 352 Ill. at 390 (possession of tenant is constructive notice of rights of landlord in property, even if legal title to property indicates another) ***." *Banco Popular v. Beneficial Systems, Inc.*, 335 Ill. App. 3d 196, 211 (2002).

¶ 65 In *Banco Popular*, George and Helena Kaltezas owned property which contained a building that had fallen into disrepair. *Banco Popular*, 335 Ill. App. 3d at 199. The City of Chicago instituted a building code violation case against the Kaltezases, which resulted in the filing of a *lis pendens* notice with the recorder's office in 1995. *Banco Popular*, 335 Ill. App. 3d at 199. The Kaltezases hired Morris Reynolds to do work on the property, but he eventually filed a claim for breach of contract against the Kaltezases and sought a lien on the

property. *Banco Popular*, 335 Ill. App. 3d at 199. Reynolds was awarded judgment against the Kaltezases, and the judgment was recorded in the Cook County recorder of deeds office on May 3, 1996. *Banco Popular*, 335 Ill. App. 3d at 199.

¶ 66        Before the judgment was entered, the Kaltezases executed a quitclaim deed conveying all interest in the property to Marsha Azar, through her nominee Saul Azar. *Banco Popular*, 335 Ill. App. 3d at 199. The deed was delivered on March 13, 1995, and stated that Marsha Azar had the right of equitable ownership in the property and the building, " 'even if it [was] not recorded by way of deed conveying and vesting such legal ownership.' " *Banco Popular*, 335 Ill. App. 3d at 199. The Azars paid taxes on the property, paid the water bill and brokers' commissions, placed a sign in the building's window stating that their company was managing the property, changed the name of the tax addressee to their company, dealt with the local police department and alderman's office in rehabilitating the property, and leased the property to new tenants. *Banco Popular*, 335 Ill. App. 3d at 199. Saul Azar told Reynolds' attorney that he and Marsha had purchased the property. *Banco Popular*, 335 Ill. App. 3d at 199. Saul Azar also appeared in open court to defend the building code case instituted by the City of Chicago, and the case was eventually dismissed when the Azars completed all necessary repairs on the property. *Banco Popular*, 335 Ill. App. 3d at 200. However, the Azars did not record the quitclaim deed. *Banco Popular*, 335 Ill. App. 3d at 200.

¶ 67        After the judgment in favor of Reynolds was rendered, he assigned the judgment to Benefit Systems, Inc. *Banco Popular*, 335 Ill. App. 3d at 200. Benefit Systems' president searched the records and found the *lis pendens* notice, but did not review the court file or inspect the property. *Banco Popular*, 335 Ill. App. 3d at 200. On August 6, 1996, Marsha Azar recorded the deed she received from the Kaltezases and recorded a deed in trust on the property and a mortgage. *Banco Popular*, 335 Ill. App. 3d at 200.

¶ 68        Benefit Systems delivered the judgment to the Cook County sheriff for levy and sale on August 16, 1996. *Banco Popular*, 335 Ill. App. 3d at 200. Benefit Systems successfully purchased the property at the sheriff's sale, and Benefit Systems notified Marsha Azar of the sale. *Banco Popular*, 335 Ill. App. 3d at 200. Marsha Azar, and Banco Popular as trustee, brought suit against Benefit Systems to set aside the sheriff's deed. *Banco Popular*, 335 Ill. App. 3d at 200. Benefit Systems filed a counterclaim to quiet title and establish its priority in the mortgage. *Banco Popular*, 335 Ill. App. 3d at 200. The trial court granted summary judgment to Marsha Azar and Banco Popular. *Banco Popular*, 335 Ill. App. 3d at 201.

¶ 69        On appeal, we found that *Beals* and *Miller* found that possession of a property can "be equivalent to the recording of a deed as to a judgment creditor who claims an interest in the property of which another has possession when the creditor secured the judgment." *Banco Popular*, 335 Ill. App. 3d at 210 (citing *Beals v. Cryer*, 99 Ill. App. 3d 842, 844 (1981), and *Miller*, 381 Ill. at 243). Possession must provide some measure of notice to the outside world of the possessor's interest. *Banco Popular*, 335 Ill. App. 3d at 211 (citing *Beals*, 99 Ill. App. 3d at 844). Evidence of possession includes making improvements on the property, posting signs on the property, and possession of the property by a tenant of the person claiming possession. *Banco Popular*, 335 Ill. App. 3d at 211.

¶ 70 What constitutes possession in this respect will depend on the facts of the case and is thus a question of fact. *Banco Popular*, 335 Ill. App. 3d at 211. Therefore, the Azars' actions created questions of fact about whether or not they "possessed" the property and whether or not their actions put Reynolds and Benefit Systems on constructive notice of Marsha Azar's interest in the property. *Banco Popular*, 335 Ill. App. 3d at 211-12. Therefore, we reversed the grant of summary judgment and remanded for further proceedings. *Banco Popular*, 335 Ill. App. 3d at 214.

¶ 71 In summation, US Bank had before it a series of facts that should have led it to inquire further before issuing its loan and mortgage. This is a duty imputed by the law. US Bank relies on *Connor v. Wahl* in alleging that Illinois precedent requires that "[w]here one of two innocent persons must suffer by reason of fraud or wrong conduct of another the burden must fall upon him who put it in the power of the wrongdoer to commit the fraud or do the wrong." *Connor v. Wahl*, 330 Ill. 136, 146 (1928). US Bank urges us to find that Ellis should be held responsible for placing the power in PTC to commit fraud. However, we find that US Bank is not without fault for the reasons noted. Thus US Bank is not a *bona fide* mortgagee without notice. We come to this conclusion without considering Villasenor's role in any fraud that may have been committed upon Ellis.

¶ 72                                    III. Conclusion

¶ 73 For the reasons noted above, US Bank is not a *bona fide* mortgagee without notice. Therefore we affirm the trial court in denying US Bank's motion to reconsider and affirm the grant of summary judgment in favor of Ruthie Lee Ellis.

¶ 74 Affirmed.